UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>ANDREW ANANIA | Case No. 19 CR 532<br><br>Honorable Sharon J. Coleman |

### Government's Response to Defendant's Motion for Release

Defendant Andre Anania's motion for release from pretrial detention should be denied. As Chief Judge Pallmeyer previously concluded, there are no conditions that can reasonably ensure the safety of the community in the event of defendant's release. Defendant has presented no new information that warrants reversal of Chief Judge Pallmeyer's prior holding.

On August 31, 2017, defendant Andrew Anania was convicted of conspiracy to commit first degree murder, and sentenced to ten years' imprisonment. On February 15, 2019, while on parole for his murder conspiracy conviction, defendant was armed with a loaded semi-automatic handgun. When defendant was approached by Chicago Police, he fled, leading them on a two-block chase through a residential neighborhood before tossing the loaded gun into a residential yard. Bodyworn cameras captured defendant claiming post-arrest that he had taken the firearm from a friend and thrown it over the fence.

On May 7, 2020, defendant filed an emergency motion for pretrial release, based on the argument that his lupus makes him susceptible to a serious form of

Covid-19. R. 25. On May 25, 2020, Chief Judge Rebecca R. Pallmeyer denied defendant's motion for release, noting "Mr. Anania has prior convictions for crimes of violence…and was on parole after serving time for murder conspiracy at the time he was apprehended, in possession of a semi-automatic weapon. His evident failure to comply with parole conditions gives little confidence he would comply with conditions imposed by this court." R. 31.

Defendant brings the present motion on the same grounds as his previous emergency motion: that he is concerned that he is susceptible to Covid-19 due to his lupus condition. Defendant is currently incarcerated at the Jerome Combs Detention Center in Kankakee. Defendant does not argue that he currently has Covid-19 or that he has been exposed to anyone who has Covid-19. No Kankakee inmate has been diagnosed with Covid-19; and the jail has robust protective measures in place.

Defendant poses a danger to the community and a risk of nonappearance before this Court. Given the nature of the charges against defendant, the weight of the evidence; defendant's criminal history; and Kankakee's efforts to mitigate the transmission and spread of Covid-19, defendant's motion should be denied.

I. BACKGROUND

On June 26, 2019, a grand jury returned an indictment charging defendant with being a felon in possession of a firearm, in violation of Title 18, United States Code, Section 922(g)(1). R.1. On June 28, 2019, the Court ordered an issuance of a *writ* of *habeas corpus ad prosequendum* directed to the Illinois Department of

2

Corrections, to transfer defendant to federal custody. R. 6, 7. On July 18, 2019, defendant appeared before the Court for an arraignment and initial hearing. R. 9. The government moved for detention and defendant waived a detention hearing. *Id.*

On May 7, 2020, defendant filed an emergency motion for pretrial release, based on the argument that his lupus makes him susceptible to a serious form of Covid-19. R. 25. On May 25, 2020, Chief Judge Rebecca R. Pallmeyer denied defendant's motion for release.

On July 23, 2020, defendant filed the present motion on the same grounds as his previous emergency motion: that he is concerned that he is susceptible to Covid-19 due to his lupus condition. R. 33.

**II.   ARGUMENT**

Pursuant to Title 18, United States Code, Section 3142(f), the Court may reopen a detention hearing if the Court "finds that information exists that was not known to the movant at the time of the hearing" before Judge Pallmeyer, and that that information "has a material bearing on the issue whether there are conditions of release that will reasonably assure the appearance of such person as required and the safety of any other person and the community."

Defendant has raised no new material information bearing on the issue as to whether there are conditions that would assure the appearance of the defendant or the safety of the community.

3

The information presented in defendant's motion does not alter the evaluation of the § 3142 factors conducted by Judge Pallmeyer. On considering whether defendant should be detained, Judge Pallmeyer took into account (1) the nature and circumstances of the offenses charged; (2) the weight of the evidence; (3) the defendant's history and characteristics, including his "physical and mental condition;" and (4) the nature and seriousness of the danger to any person or the community that would be posed by the defendant's release. 18 U.S.C. § 3142(g). Those are the same factors the Court would consider if it considers defendant's new information sufficient to reopen the defendant's detention hearing.

### A. The Nature and Circumstances of the Offenses and Weight of the Evidence

Defendant has been charged with a serious offense that poses a real danger to the community and defendant's actions in the commission of this offense demonstrate a risk of nonappearance. On February 15, 2019, Chicago Police officers were on patrol near the intersection of West 23rd Street and South Albany Avenue in Chicago. The officers recognized defendant as an individual who had an outstanding warrant for his arrest due to a parole violation. The officers approached defendant asking to talk to him. Defendant responded by running away from the officers, through a residential neighborhood. During the two block chase, an officer observed defendant remove a firearm from his waistband. Defendant fled into the gangway of a stranger's residence and threw the firearm across the neighbor's fence. Officers arrested

4

defendant and recovered the firearm. The firearm was a loaded .38 caliber Blue Steel Bersa Thunder semi-automatic handgun and accompanying magazine.

After defendant had been advised of his *Miranda* rights, defendant made a statement, recorded on video, in which he claimed that he met an unknown friend in the residential gangway, that the friend had a firearm, and that the defendant took the friend's firearm and threw it over the neighbor's fence. Defendant stated that he did not remember the friend's name.

The indictment charges defendant with being a felon in possession of a firearm. R. 1. The weight of the evidence is extremely strong. The bodyworn cameras worn by the officers covers the entire chase of the defendant, the arrest of the defendant, and the defendant's post-arrest statement admitting to throwing a firearm over the fence next to where he was arrested.

Defendant's actions posed a serious danger to the community. The law recognizes that a felon possessing a firearm in *any* context poses a danger. This is not a case of a felon merely possessing a firearm in his bedroom closet. The defendant here was walking the streets of Chicago with a loaded, semi-automatic pistol. When approached by police, defendant ran with this loaded weapon through a residential neighborhood. Defendant then threw this loaded firearm into the yard of a residential home where children lived. This is a very serious offense that created a significant danger.

Defendant's actions in this case are also evidence of the risk of nonappearance posed by the defendant. Defendant showed that his initial response when approached by law enforcement was to flee. This was not a momentary instinct: defendant ran for approximately two blocks, down two streets, and into a stranger's yard.

### B. The History and Characteristics of the Defendant

Defendant's history and characteristics further demonstrate that no condition or combination of conditions can adequately ensure the safety of the community or defendant's appearance before this court.

According to information obtained from Pretrial Services, on August 31, 2017, defendant pled guilty to conspiracy to commit first-degree murder, and sentenced to ten years of imprisonment. Defendant was on parole for that offense when he was carrying the firearm at issue in this case.

Defendant's prior conviction for conspiracy to commit first degree murder is a violent offense that clearly shows that this defendant poses a danger to the community.

With regards to defendant's risk of non-appearance, defendant's disregard of the terms of his state parole exhibits defendant's unwillingness to follow the orders of the court. Defendant's flight from police in this case is also evidence of defendant's risk of nonappearance.

6

### C. Defendant's Claim of a Risk of Contracting Covid-19 Does Not Warrant Release.

Consideration of defendant's "physical and mental health" support his continued detention. Currently, there are no cases of Covid-19 at the Kankakee detention center. Defendant does not allege that he has contracted Covid-19 or been exposed to someone infected with the virus, let alone provide evidence of infection or exposure. Moreover, the Jerome Combs Detention Center has implemented substantial precautionary measures to mitigate that risk, as the government describes below.[1]

Defendant summarily claims that his history of lupus creates a "heightened risk of contracting a very serious form of Covid-19." R.25, at 2. Defendant's medical records show that defendant, a 24 year old man, does have lupus. D. 28 at 4. However, the prospect of suffering complications from an infection with which he has not yet been diagnosed does not qualify as an exceptional reason warranting release under § 3145(c). *See, e.g., United States v. Peel*, No. 06-CR-30049-WDS, 2007 WL 1021974, at *3 (S.D. Il. April 3, 2007) (finding that defendant's claims of potentially suffering harm while in pretrial custody were not "exceptional reasons" for release).

Nevertheless, the government takes seriously any claim that a detainee suffers from an underlying health condition which would place the detainee at a higher risk for complications associated with COVID-19, particularly where such claims are

---

[1] The following representations are based on materials provided by Chad Kolitwenzew, Chief of Corrections at the Jerome Combs Detention Center.

supported by documentary evidence. Defendant cites his documented diagnosis of lupus as an exceptional reason that warrants his release. While the government recognizes the seriousness of defendant's medical condition and the potential risks he faces, the government does not believe defendant has met his burden for release on this record.

### 1. Effect of Lupus

The Lupus Research Alliance advises that while people with lupus "could be at greater risk for infections in general," "there is no specific data on the virus causing Covid-19 in patients with lupus. Thus, the rate and the severity of the infection in lupus patients is not yet known." Lupus Research Alliance, COVID-19 Frequently Asked Questions, *available at* https://www.lupusresearch.org/covid-19-frequently-asked-questions, accessed September 14, 2020). The Centers for Disease Control and Prevention ("CDC") has cautioned that "having a weakened immune system may increase your risk of severe illness from COVID-19"," but does not identify lupus specifically. Centers for Disease Control and Prevention, People with Certain Medical Conditions, *available at* https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html, accessed September 14, 2020.

The CDC has recommended that individuals who are immunocompromised "continue any recommended medications or treatments and follow the advice of your healthcare provider." *Id.* Defendant has neither asserted nor offered evidence that

8

he is unable to continue his current lupus treatment regime. Rather, it appears from defendant's medical records that Kankakee is aware of defendant's lupus and has continued providing medication, including Plaquenil (hydroxychloroquine) to defendant. News reports indicate that defendant could have a much more difficult time getting hydroxycholoroquine upon his release, due to shortages caused by the theory that the drug is effective in the treatment of Covid-19[2].

On this record, defendant's lupus diagnosis, alone, does not amount to an exceptional reason warranting release.

### 2. Comprehensive Precautionary Measures Have Been Instituted at the Kankakee Jail to Avoid a Covid-19 Outbreak.

The Kankakee detention center has established a comprehensive set of precautionary measures to limit the risk of Covid-19 transmission into and inside the jail. No prisoner or staff member has tested positive for Covid-19 or is known to have been exposed to the virus. The facility has proactively tested inmates for Covid-19; all tests conducted thus far have come back negative. The jail is committed to providing all necessary precautionary measures and supportive therapies to avoid an outbreak of Covid-19, including taking all of the preventative actions advised by the CDC and the Illinois Department of Public Health to protect against the disease.

---

[2] *See e.g.* John Murphy, "Critical drug shortages caused by COVID-19," MDLinx (August 21, 2020, available at https://www.mdlinx.com/article/critical-drug-shortages-caused-by-covid-19/1yrBAMojw6N6vw7s1czB7c).

Kankakee jail officials recognize the threat posed by the transmission of viruses inside a jail and have substantial experience ensuring that viral outbreaks do not occur. Health and prison officials recognize that Covid-19 carries an increased risk of transmission, carries a higher fatality rate than many other viruses, and has resulted in a state of emergency nationwide. Accordingly, the Kankakee jail has employed the following measures[3]:

- *Social Visitation.* The Kankakee jail has placed a temporary hold on all social visits, such as visits from friends and family, to limit the number of people entering the jail and interacting with detainees. Detainees can conduct social visitation via video equipment. In-person attorney visits are also temporarily suspended. Attorney visits are to be conducted through the detainee's iPads or telephones. The only in-person visits allowed during this time are visits with medical staff. All group gatherings within the facility have been cancelled.

- *Detainees Entering the Facility.* The Kankakee jail houses both state and federal detainees and, at this time, fewer detainees are entering the facility. The jail has suspended accepting inmates sentenced to weekends, work release, or any intermittent sentence.

- *Screen Procedures.* In the few instances in which a new detainee enters the Kankakee jail, he or she will be screened for symptoms and must complete a risk-assessment questionnaire. The screening process includes taking the detainee's temperature. All new inmates will remain in a separate pod from 5 to 14 days until cleared by medical staff.

- *Detainee Movement.* The district court's Fifth Amended General Order, dated July 10 2020, authorized the use of teleconferencing and videoconferencing for most criminal proceedings. This means that most federal detainees will not need to leave the Kankakee jail for court appearances. Similarly, Administrative Order 20-19 of the Circuit Court for the Twenty-First Judicial Circuit provided for increased reliance on

---

[3] Because the health crisis is rapidly changing, new policies and procedures at the Kankakee jail are continually being implemented.

10

virtual proceedings.[4] In the event that a detainee has a court appearance, he or she will be screened for symptoms before entering the transport van and, upon reaching the courthouse, his temperature will be taken via a forehead thermal reader to ensure he or she does not have a fever. The detainees are also issued masks when they need to go to court or to receive medical treatment.

- *Sanitation and Hygiene.* Detainees are provided with soap to wash their hands at any time throughout the day. Bottles of disinfectant are also stocked in all housing units. In addition, the jail is conducting a disinfection routine three times a day, which covers door handles, toilets, showers, and tables. Hand sanitizer is stocked in every housing unit. Detainee restraints are disinfected after each use. No contractors are able to enter a detainee area, other than in case of emergency, before all detainees have been removed from that area. After the contractor leaves, and before detainees return, the area is sanitized with approved Ecolab chemicals. All detainees receive handouts regarding hygiene and sanitization in English and Spanish. Further hygiene and disinfection instructions are posted throughout the jail.

- *Quarantine.* The Kankakee jail is following the CDC guidelines on testing for Covid-19 and isolation of persons with symptoms and/or risk exposure factors. If a detainee exhibits flu-like symptoms, that detainee will be isolated. If a detainee exhibits Covid-19 symptoms, the detainee will be isolated in a negative pressure room (where air is not circulated to other parts of the jail) for observation and treatment by medical staff. Asymptomatic inmates with exposure risk factors are quarantined.

- *Correctional Officers.* Although correctional officers need to enter and to re-enter the facility, they have been ordered to stay home if they have any symptom of the disease. Enhanced health screening of staff will be implemented in areas with "sustained community transmission," as determined by the CDC. Such screening includes self-reporting and temperature checks. Staff have their temperature checked upon entry to the jail and are required to wear a mask upon entering the facility.

---

[4] Administrative Order 20-19 is available at https://courts.illinois.gov/Administrative/covid/052820-21Circ_AO-2.pdf (last visited September 14, 2020).

11

In short, the Kankakee jail has implemented comprehensive measures to protect detainees and staff from Covid-19, as this Court has found before. (Case No. 20 CV 1792, R. 54 (Mar. 31, 2020) ("The Kankakee Correctional Facility has engaged in robust measures to ensure the safety of the pretrial detainees including not permitting outside visitors for the past 18 days, quarantining new admissions, and treating anyone with medical conditions."); *see also id.*, R. 61 (Mar. 31, 2020) (same); *id.*, R. 99 (Apr. 2, 2020) (Dow, J.) ("[The Combs facility . . . has engaged in robust measures to ensure the safety of the pretrial detainees including not permitting outside visitors for nearly three weeks, quarantining new admissions, and treating anyone with medical conditions.").)

In short, defendant presumes that his risk of contracting Covid-19 is greater in custody than in the community, but he resides in a facility where there is no known instance of the virus, where social contact with the outside world is suspended, and where entrants (staff and inmates) are screened, isolated, or both. By contrast, the number of infections in the Chicago area, where defendant proposes that he be released, keeps rising.

### 3. Defendant's Medical Needs Are Being Adequately Addressed.

By virtue of being in a detention facility, defendant is in the presence of medical professionals at all times. The Kankakee jail has doctors and nurses who monitor and provide care onsite to detainees. If intensive treatment unavailable in the jail is necessary, detainees are transported to community hospitals in the event of an

12

emergency. Between the medical professionals at the Kankakee jail and the medical professionals at the hospitals, defendant has access to all of the care that he needs. In the event that defendant became infected with Covid-19, he would be quarantined and monitored and would receive any needed treatment, consistent with CDC guidelines.

Compare the precautionary measures instituted at the Kankakee jail and the medical attention and care available to defendant as a detainee there with what defendant proposes: release into a community with, at least, thousands of infected people, some of them unknowingly carrying and potentially spreading the virus.

Courts, moreover, have generally recognized that "it is a rare case in which health conditions present an 'exceptional reason'" to allow for release where detention would otherwise be warranted. *United States v. Wages*, 271 Fed. App'x 726, 728 (10th Cir. 2008). Those cases recognize that reasonably necessary treatments are available in prison, and a prison setting will often provide superior care than a defendant can obtain elsewhere. Defendant has not made a factual record that his medical needs will not be met while he is in custody.

### D. Releasing Defendant to his Mother's Custodianship Will Not Adequately Protect the Community or Ensure Defendant's Appearance.

There are no conditions of release, or combination of conditions, that could assure the safety of the community or the appearance of the defendant. Even if the

13

Court were to conclude that there are some combination of release conditions that could protect the community, those proposed by the defendant are inadequate.

Defendant does not propose offering any bond or any property to secure his bond. A secured bond would create some incentive for the defendant to appear before the Court and create some disincentive for the defendant to endanger the community with his possession and use of firearms.

Defendant proposes that his mother serve as a third party custodian. R. 33, at 3. The government has not yet received a Pretrial Services report on defendant's mother's suitability to serve as defendant's custodian.

Furthermore, awarding such relief would place a substantial and unwarranted burden on Pretrial Services. A Pretrial Services officer must evaluate the proposed residence and meet the proposed third-party custodian and other people who live in the residence. In addition, whenever the court orders electronic monitoring as a condition of home confinement, a location monitoring specialist is appointed to oversee the release. One case alone would not overwhelm the system, but if the court were to release this defendant, many more defendants would seek their own release, endangering the community and stretching the capacity of Pretrial Services. A large number of release orders would force officers to conduct a substantial amount of *in-person*, *in-home* meetings, exposing them to a heightened risk of infection—just what defendant purportedly seeks to avoid for himself. *See, e.g., United States v. Hamlin*, 2020 WL 1703848, at *7 (E.D. Wis. Apr. 8, 2020) ("[I]n a situation in which the

14

defendant presents both a risk of non-appearance and a danger to the community, and where that defendant is not at significantly higher risk for severe illness if infected, and where the defendant's release plan is short on details, the court must include in the balance of factors whether the risk to the probation officer is warranted").

## III. CONCLUSION

For the reasons stated, the defendant's motion for release should be denied.

Respectfully submitted,
JOHN R. LAUSCH, JR.,
United States Attorney

By: *s/ Cornelius A. Vandenberg*
CORNELIUS A. VANDENBERG
Assistant United States Attorneys
219 South Dearborn Street
Chicago, Illinois 60604
(312) 353-5310