```
 1            IN THE UNITED STATES DISTRICT COURT
          FOR THE NORTHERN DISTRICT OF ILLINOIS
 2                    EASTERN DIVISION

 3
   UNITED STATES OF AMERICA,        )   No. 19 CR 532-1
 4                                  )
                    Plaintiff,      )
 5                                  )
            v.                      )   Chicago, Illinois
 6                                  )   September 22, 2020
   ANDREW ANANIA,                   )   11:35 a.m.
 7                                  )        Video
                    Defendant.      )   Detention Hearing
 8

 9              TRANSCRIPT OF PROCEEDINGS
       BEFORE THE HONORABLE SHARON JOHNSON COLEMAN
10

11 APPEARANCES:

12 For the Government:        HON. JOHN R. LAUSCH, JR.,
                             United States Attorney, by
13                           MR. CORNELIUS A. VANDENBERG, III
                             Assistant United States Attorney
14                           219 South Dearborn Street
                             Suite 500
15                           Chicago, Illinois  60604

16
   For the Defendant:        FEDERAL DEFENDER PROGRAM
17                           55 East Monroe Street
                             Suite 2800
18                           Chicago, Illinois  60603
                             BY:  MR. SANTINO COLEMAN
19

20 U.S. PRETRIAL SERVICES:  MR. PEDRO RANGEL

21

22
             TRACEY DANA McCULLOUGH, CSR, RPR
23                Official Court Reporter
              219 South Dearborn Street
24                    Room 1232
               Chicago, Illinois  60604
25                  (312) 435-5570
```

1          THE CLERK:  19 CR 532, USA versus Andrew Anania.

2          THE COURT:  All right.  Government.  The government

3   cannot hear me.  Mr. Vandenberg?

4          MR. VANDENBERG:  (Unintelligible).

5          THE COURT:  There you go.  All right.  Say your name

6   again because I don't know if the court reporter heard you.

7   Government.

8          MR. VANDENBERG:  (Unintelligible).

9          THE COURT:  All right.  So you have a, you have a

10  corrupted some type of exchange here, so we're only getting a

11  little bit of your voice.  I'm going to have everybody else

12  announce themselves.  We're going to come back to you again.

13  We know who you are.  We've got your spelling.  I just want to

14  make sure that your statements -- we can hear you clearly

15  throughout the time we're talking.  Can you not hear me now?

16         MR. VANDENBERG:  I can't hear you.

17         THE COURT:  You can't hear me, and we're barely

18  hearing you.  All right.  We're going to try it again.  Mr.

19  Coleman, go ahead and state your name.

20         MR. COLEMAN:  Santino Coleman with the Federal

21  Defender Program.

22         THE COURT:  All right.

23         MR. COLEMAN:  On behalf of Andrew Anania.

24         THE COURT:  All right.  We have Mr. Coleman.  And you

25  can hear me clearly?

1          MR. COLEMAN:  Yes, I can hear you.

2          THE COURT:  Okay.  All right.  Who do we have from --

3    Mr. Anania, and you can hear us still, sir?

4          DEFENDANT ANANIA:  Yes, Your Honor.

5          THE COURT:  All right.  Good.  We can hear you

6    clearly.  What about Pretrial?  Mr. Rangel.

7          MR. RANGEL:  Yes.  Pedro Rangel.

8          THE COURT:  All right.  Good.  We can hear you now.

9          MR. RANGEL:  On behalf of U.S. Pretrial Services.

10   I'm here.  I can hear you.

11         THE COURT:  All right.  Thank you very much.  And

12   government, let's try you again.  Mr. Vandenberg.

13         MR. VANDENBERG:  Cornelius Vandenberg.  Sorry, Your

14   Honor, (unintelligible).

15         THE COURT:  Yes, it's both ways.  I can barely hear

16   you.  You're going in and out.  You're breaking up.  And you

17   can't hear me,  correct?

18         MR. VANDENBERG:  Correct.

19         THE COURT:  All right.  Can you go out and come back

20   in?  Mr. Vandenberg, can you -- okay.  We're going to wait a

21   second and see if he comes back in.  All right.  Mr.

22   Vandenberg, you're going to try again.  You're still -- your

23   screen is going in and out.  Can you hear me?  Mr. Vandenberg.

24   You can't, you can't hear me?

25         MR. VANDENBERG:  I can barely hear you.

1    THE COURT:  Barely hear me.  Can you -- we're going
2  to see if -- can you hear me at all?  No.
3    MR. VANDENBERG:  I can hear you -- (unintelligible).
4  Your Honor, I'm going to try calling in.
5    THE COURT:  All right.  We can try that.  No problem,
6  Mr. Vandenberg.  Let's try that.
7    (Brief pause.)
8    THE COURT:  All right.  We're going to try this
9  again.  All right.  So let's just make sure everybody at least
10  state your name.  Starting with the government.  Okay.  You're
11  silent again.  Government you're silent.  It looks like you can
12  hear me, but I can't hear you.
13    THE CLERK:  Mr. Vandenberg, it shows that you're on
14  mute.
15    MR. VANDENBERG:  I've called in through the
16  telephone.
17    THE COURT:  Okay.  Now, we can hear you, but you're
18  messed up.  We're going to try it again.  Mr. Coleman, you can
19  hear us fine?
20    MR. COLEMAN:  Yes, I can hear you.
21    THE COURT:  Okay.  But you don't sound quite clear
22  either.  All right.  Mr. Anania, can you hear us?
23    DEFENDANT ANANIA:  Yes, Your Honor.
24    THE COURT:  Clearly?
25    DEFENDANT ANANIA:  Yes.

1          THE COURT:  All right.  Rangel.

2          MR. RANGEL:  Yes, Your Honor, I can hear you clearly.

3          THE COURT:  All right.  Good.  All right.

4    Government.

5          MR. VANDENBERG:  All right.  I've muted the telephone

6    call, which is how I was able to be heard earlier.  If you

7    could unmute that, you'd be able to hear me again.  Are you

8    able to hear me on the --

9          THE COURT:  There we go.

10          MR. VANDENBERG:  All right.

11          THE COURT:  There we go.  All right.

12          MR. VANDENBERG:  Great.

13          THE COURT:  Okay.  I think we're all good.  Mr.

14    Coleman, you're good?  Mr. Coleman.

15          MR. COLEMAN:  Yes, I'm good.

16          THE COURT:  Okay.  Good.  All right.  We're going to

17    get started here.  So the case has been called.  I believe

18    everybody has been identified for the record, correct, Miss

19    McCullough?

20          THE COURT REPORTER:  Yes.

21          THE COURT:  All right.  So let's go forward on this

22    motion for pretrial release from the defendant.  Mr. Coleman.

23          MR. COLEMAN:  Thank you, Your Honor.  Your Honor, we

24    are seeking Mr. Anania's pretrial release in this case.  Under

25    the Bail Reform Act in this particular case there's a

1   presumption of release under 3142 (b).  And that presumption

2   doesn't even contemplate conditions.  The Bail Reform Act also

3   indicates that if the Court doesn't believe release without

4   conditions is appropriate, then it again presumes that a person

5   will be released with the least restrictive conditions

6   necessary to ensure that they appear for court and for the

7   safety of the community.

8          Only if the Court finds there are absolutely no

9   conditions whatsoever that could be put in place to ensure

10  appearance in court and community safety should a person in Mr.

11  Anania's circumstances be denied release.  And given Mr.

12  Anania's ties to the community, we think it's appropriate for

13  this Court to consistent with the Bail Reform Act --

14          THE COURT:  I'm sorry.

15          MR. COLEMAN:  -- allow Mr. --

16          THE COURT:  I need you to go back to you think

17  it's -- given his ties to the community, you think it's

18  appropriate for what?  It went, it went out.

19          MR. COLEMAN:  Given his ties to the community, it is

20  appropriate for this Court to release Mr. Anania with

21  conditions.  And I say that for several reasons.  As I indicate

22  in the motion, Mr. Anania upon release would go stay with his

23  mother Francesca Hallin.  She is on the line.  She is willing

24  to serve as third party custodian.  Miss Hallin, who is with

25  her husband and her daughter, Mr. Anania's little sister.  And

1    this is a, a warm, loving, supportive environment where Mr.

2    Anania can go as his case proceeds.

3              Mr. Anania has a number of health concerns that the

4    Court should also take into consideration.  As I noted in the

5    motion, Mr. Anania suffers from lupus.  He was diagnosed with

6    this condition as a child.  So throughout his life he has

7    suffered and received treatment for this condition.  And it

8    makes him vulnerable beyond the issues with COVID.  Mr. Anania,

9    even with COVID will be a vulnerable person in a prison

10   institution setting, and he is.  And an example of that was

11   shown.  A few months ago back in July he was complaining of

12   shortness of breath.  He was never administered a COVID test.

13   He did receive a chest X-ray.

14             And following that X-ray he was placed into 24-hour

15   lockdown, isolated in a separate cell; and he, he remained

16   there for a, a number of weeks.  I tried to figure out what was

17   going on, and they told me they -- I mean, I couldn't really

18   get a clear explanation.  They've never provided Mr. Anania a

19   clear explanation.  I was told that they thought he might have

20   TB or something along those lines, but I don't believe that was

21   ever concluded.  And so he was just kept in essentially

22   solitary confinement for weeks.

23             THE COURT:  All right.  Mr. Coleman.

24             MR. COLEMAN:  And --

25             THE COURT:  Mr. Coleman, if I can interrupt real

1    quickly here.  So there was never any tests given to him,

2    whether it was COVID or TB test?  They never gave a test to

3    anybody -- to him?

4            MR. COLEMAN:  No.  My understanding he was, he was

5    not given a COVID -- a test for COVID.  In terms of the TB,

6    what I understood is that he -- a chest X-ray was done, and

7    they saw something on his chest X-ray that prompted them to

8    place him into this 24-hour isolation.

9            THE COURT:  Well, I under -- I understand --

10           MR. COLEMAN:  But according to --

11           THE COURT:  I understand what you're saying on that.

12   I did read the briefs about seeing something.  But the Court

13   just doesn't understand during this time, because Judge

14   Pallmeyer looked at this before.  I'm sure the government was

15   aware and monitoring people closely about their health.  How

16   this person wasn't given a test.  I don't get that.  So he just

17   was placed in isolation.  Now, if he's on -- if he has lupus,

18   then he would have been I'm assuming have a regular

19   prescription for hydroxychloroquine.  That's one of the drugs

20   that people with lupus take on a regular basis, which according

21   to the leader of the country is something that is supposed to

22   help you with COVID.  I'm not saying that that is a fact, but

23   that's what is out, that's supposed to be a positive treatment.

24           But either way someone should know and he should be

25   tested when he already has a verified illness.  The government

1  isn't saying he's not -- doesn't have lupus to my knowledge.

2  That he should be tested for COVID 19.  Has there, has there

3  been a specific request made for him to be tested, Mr. Coleman?

4          MR. COLEMAN:  Your Honor, Mr. Anania requested that

5  he receive that test.  He was never given a COVID --

6          THE COURT:  Okay.  I wasn't talking about Mr. Anania.

7  Was there a request by your office as his lawyers for him to

8  get a test?

9          MR. COLEMAN:  Well, I reached out to, I reached out

10  to the U.S. Marshal Service to determine what was going on.

11  Whether he had -- you know, why he was placed in isolation and,

12  and what was going on with his health.  But I -- you know, I --

13  but this -- that's, that's the concern here, and I -- you know,

14  and in, in addition to my argument that, you know, Mr.

15  Anania -- I mean, notwithstanding COVID 19, I think the law and

16  the fact that he has family ties should support his release.

17          But on top of that, we then have this situation with

18  COVID 19.  You know, he was never given a test.  And he's just

19  a vulnerable individual.  And he has a, a home where he can go

20  where he can be safe, not be exposed to the potential risk of

21  COVID 19 and the continued risk of having lupus in that

22  setting.  And I think that that would be best here.  You know,

23  as I explain in the motion, Mr. Anania suffers from skin

24  lesions, facial scarring, delayed wound healing, and joint

25  damage.  He's been using a cane since I, I first met him on

1  this case.  He still uses that cane.

2         And so he's -- he's just someone that, you know, has

3  a heightened vulnerability, and he can be placed on conditions

4  and proceed with this case in a better setting.

5         THE COURT:  All right.  Thank you.  Thank you, Mr.

6  Coleman.  And I may ask you for more argument in a second, but

7  thank you.

8         So government you can respond.  Then I'll hear what

9  Pretrial's recommendation is.  Go ahead government.

10         MR. VANDENBERG:  Yes, Your Honor.  The government's

11  position is that defendant's motion for release from pretrial

12  detention should be denied.  We believe that it is the

13  community that would be at heightened vulnerability if Mr.

14  Anania were released.  As Judge Pallmeyer previously concluded,

15  there's no conditions that can reasonably ensure the safety of

16  the community, and --

17         THE COURT:  All right.  Excuse me.  Excuse me,

18  government.  If I could ask.  Was Judge Pallmeyer -- and that

19  was during our -- the height of the emergency where I don't

20  believe -- did she have video contact on this case?

21         MR. VANDENBERG:  She did not have video contact.

22         THE COURT:  All right.  So, so was --

23         MR. VANDENBERG:  She had full briefing.

24         THE COURT:  Let me ask you this:  Was Mr. Anania's

25  mother available for -- was this the option for him to be

1    released before?

2            MR. VANDENBERG:  Judge Pallmeyer's position was not

3    that the proposed conditions were inadequate or that the

4    testing of those, whether they could be stronger or not.  Judge

5    Pallmeyer's position as stated in her opinion was that there

6    were no conditions that would reasonably assure the safety of

7    the community.  Therefore, the questioning of the defendant's

8    mom, who I'm sure obviously is a wonderful person for

9    volunteering to be a third party custodian and the government

10   has no problem with the defendant's mother.  The problem is the

11   defendant himself.  And the government's position and Judge

12   Pallmeyer's position were that no conditions would be adequate

13   for his release.

14           We were at the point where we were hammering out what

15   those conditions would look like because of the defendant's

16   record, because of his actions in this case.  The defendant is

17   someone who was convicted of conspiracy to commit first degree

18   murder extremely recently.  That was in August 2017.  He was on

19   parole for that case, for that conspiracy to commit first

20   degree murder for a 10-year sentence when this case took place.

21   He was walking down the streets of Chicago with a loaded

22   semiautomatic handgun.  He was approached by Chicago Police.

23   He fled.  He led them on a two block chase through a

24   residential neighborhood, and he took the loaded gun and he

25   tossed it into a residential yard in a home where children

1    lived.

2            The body worn camera in this case showed post arrest,

3    post-Miranda him claiming that he had taken the firearm from a

4    friend and thrown it over the fence.  He couldn't remember what

5    the friend's name was, who the friend was.

6            THE COURT:  All right.  Excuse me, government.

7            MR. VANDENBERG:  That was the explanation --

8            THE COURT:  Excuse me government.  I mean, I did read

9    your 15-page presentation.  I also was aware in general of this

10   case because it was assigned to me when Judge Pallmeyer

11   reviewed it.  And so I guess the question that the Court has is

12   a couple of things.

13           First of all, was his illness or the issues that he

14   has such as being on a cane, all of that, was that apparent to

15   your knowledge to the authorities when he was arrested for this

16   offense?

17           MR. VANDENBERG:  Yes.  Yes, Your Honor.

18           THE COURT:  So he was running with a cane?

19           MR. VANDENBERG:  No.  No.  No.  No.  His, his prior

20   medical history I should say -- you're asking at the time of

21   arrest.  No, he sprinted down for two blocks during the course

22   of the chase.  You can see from the video he doesn't need a

23   cane to walk.

24           THE COURT:  Okay.

25           MR. VANDENBERG:  His lupus --

1          THE COURT:  That's what I wanted to know.

2          MR. VANDENBERG:  I'm sorry, Your Honor.  His lupus

3    was clear as of May.  When he initially filed the brief based

4    on these same concerns about lupus and COVID, the same basis

5    for which he's bringing now, and the government has been aware

6    throughout that time, as has Pretrial, as was Judge Pallmeyer.

7          THE COURT:  All right.  But you do agree that at the

8    time that he was first heard no one knew that this situation

9    would last the amount of time it did, is that correct?  That,

10   that our whole COVID -- our COVID issue would last as long as

11   it's lasted, correct?

12         MR. VANDENBERG:  No, Your Honor --

13         THE COURT:  That was not known at the time.  That's

14   just one point, obvious point I'm bringing up.  So when he last

15   was in court in front of Judge Pallmeyer we did not know that

16   our entire institutions and our whole world would be under this

17   same threat of additional illness, correct?

18         MR. VANDENBERG:  I'm sorry, Your Honor.  I don't know

19   how to answer that.  Obviously the extent of COVID was unclear,

20   but I think we all knew that at least going through this fall

21   that there would be a strong reoccurrence, but that's --

22         THE COURT:  Well, I don't know if we did know that

23   then.  But my concern is there's still -- to your knowledge

24   there was no testing -- we knew this man had lupus.  Are you

25   all contesting that he has lupus?

1    MR. VANDENBERG:  Your Honor, he did -- he was -- no,

2  we're not contending that.

3         THE COURT:  Okay.

4         MR. VANDENBERG:  We didn't contend that in our brief

5  before Judge Pallmeyer.

6         THE COURT:  So when was he tested?

7         MR. VANDENBERG:  When he had a shortness of breath,

8  he was given a chest X-ray.  They examined for tuberculosis.

9  To date he has had no symptoms of COVID that the government is

10  aware of.  He has not been tested --

11         THE COURT:  Isn't shortness of breath a symptom of

12  COVID?

13         MR. VANDENBERG:  Again, Your Honor, when they took

14  the chest X-ray, they saw signs of tuberculosis.  And the

15  concern was that --

16         THE COURT:  Okay.  Why not a COVID test?  Do you know

17  why they did not give him a COVID test?

18         MR. VANDENBERG:  I don't know why that particular

19  doctor didn't, no, Your Honor.

20         THE COURT:  Okay.  Thank you.  All right.

21         MR. VANDENBERG:  I do know that Kankakee consistent

22  with May has not had any cases of COVID amongst the inmates.

23  Obviously that's not -- I'm not saying this defendant can't be

24  the first.  But again, they made that medical decision.  I'm

25  not in a position to back it up without calling them.

1    THE COURT: All right. Thank you. I just wanted to

2    know about at least that, about why he didn't get a simple

3    test. It seems like that would be -- it seems like getting him

4    to a place to get a chest X-ray takes a lot more effort than

5    giving the man a COVID test. Sticking a swab up his nose or in

6    his cheek, that seems like that's a lot less problematic for

7    somebody to do as opposed to taking him to get a chest X-ray.

8    And that's all the Court is wondering right now. That would be

9    something that would be different, and put the government in a

10   different position as to, yes, there's no COVID in Kankakee.

11   And I have checked up to now. Just so the record is clear, as

12   of today there are no COVID issues at Kankakee. So the Court

13   is aware.

14        I just don't understand during this time if he has an

15   underlying medical condition, why they would not take the

16   simple step of getting him a test. I don't get that. So you

17   quarantine somebody for 14 days or more. Yet you don't give

18   them a test to say he has to be quarantined. That's all I'm

19   saying. So I understand the government's position that he is

20   dangerous. I understand Judge Pallmeyer -- to the public,

21   Judge Pallmeyer's decision that he's a threat to the community.

22   And right now there's no set of circumstances at least back

23   when she did this order back in, was it April -- May, that

24   there were no set of circumstances that could change this. I

25   understand your position.

1        Again, let me hear from Pretrial, and then I will let

2    you and defense counsel follow up on whatever their

3    recommendation is.  Okay?  All right.  Mr. Rangel.

4        MR. RANGEL:  Yes, Your Honor.  As stated in the

5    Pretrial Services report that was filed on May 14th, our

6    position was that there's no condition or combination of

7    conditions that would reasonably assure his appearance as

8    required and the safety of the community.  So our position

9    would just be that we respectfully recommend that he be

10   detained in custody during the pending of this case.

11       THE COURT:  All right.  And have you checked out the

12   mother's home?

13       MR. RANGEL:  No, Your Honor, we have not checked out

14   the home.  I've only had a conversation with her.

15       THE COURT:  You've had a conversation, but you have

16   not looked at the home, is that correct?

17       MR. RANGEL:  No, Your Honor.  A home assessment has

18   not been done, Your Honor.

19       THE COURT:  All right.  And how did you speak to her?

20   I'm assuming by phone or by video, correct?

21       MR. RANGEL:  Yes, over the phone, Your Honor, back in

22   May.

23       THE COURT:  So that was back in May.  All right.

24   That wasn't, that wasn't any time since May where his request

25   was denied?  It hasn't been any time since then?

1    MR. RANGEL:  The last time I spoke to his mother was

2    back in May.  I did leave her a voice mail this morning just to

3    confirm she's still willing to, and it seems like she is she

4    stated on the phone.

5    THE COURT:  All right.  Okay.  Anything else you'd

6    like to state other than you agree with the government's

7    position that he should not be released?

8    MR. RANGEL:  No, Your Honor.

9    THE COURT:  All right.  And do you have any update on

10   his medical condition?

11   MR. RANGEL:  Not myself, Your Honor.  Not that I'm

12   aware of.

13   THE COURT:  All right.  Thank you.  All right.

14   Government, if you want to follow up on anything Mr. Rangel has

15   said.

16   MR. VANDENBERG:  I would just like to clarify, Your

17   Honor.  Your Honor characterized the government's position as

18   being based off the condition as it was.  While we do think

19   that that -- that nothing has been presented that would warrant

20   reversal of that initial determination that he be detained, we

21   also believe that if you -- from a position of approaching the

22   facts as they are now, without regards to what happened in May

23   or what the conditions were in May, that all the facts are

24   still the same.  We're not just (unintelligible) Your Honor,

25   but we believe that the --

1          THE COURT:  Okay.  Wait.  Wait.  Wait.  Wait.  Wait.

2     Wait.  One second, Mr. Vandenberg.  We're losing some of your

3     words.  Let's go back to without regard to what happened in

4     May, meaning Judge Pallmeyer's previous order.  Proceed from

5     there.

6          MR. VANDENBERG:  Yes, Your Honor.  If we were

7     approaching the case anew today, that would still be our

8     position that the defendant be detained because of the

9     seriousness of the offense, because the defendant -- because of

10    the weight of the evidence here.  Again, he's been convicted of

11    conspiracy of first degree murder.  While on parole for that

12    conviction, running through a residential neighborhood with a

13    loaded gun.  Being captured on body cam, including essentially

14    an admission to that conduct.  Regardless of what Judge

15    Pallmeyer decided in May, this would be the government's

16    position.

17         THE COURT:  All right.  Understood.  Thank you.  Mr.

18    Coleman.  And before you start, Mr. Coleman, one of the

19    questions the Court wants to ask you is at the time of this

20    offense, where he was arrested for this offense, where was Mr.

21    Anania living?  If you know.

22         MR. COLEMAN:  Your Honor, I believe he was living

23    with his stepfather at the time.

24         THE COURT:  I thought -- and the mother is married to

25    the stepfather?

1           MR. COLEMAN:  Yes.

2           THE COURT:  You said she had a husband.  Is that the

3     same stepfather?

4           MR. COLEMAN:  Yes.

5           THE COURT:  All right.  So he would have been living

6     with his mother and his stepfather.  The same place he wants to

7     go back to, would that be correct?  He's shaking his head no.

8     So we might not have all the information totally straight.  Why

9     don't I -- since she's on the phone, I'm going to allow the

10    mother to speak.  We're going to unmute her.  Unmute yourself,

11    ma'am.  And you can go ahead and speak, but only answer the

12    questions that are put to you.  I'm going to let Mr. Coleman

13    ask you a few questions.  Okay.  Ma'am?

14          MS. HALLIN:  Okay.

15          THE COURT:  All right.  Before we get started, state

16    your name.

17          MS. HALLIN:  Francesca Hallin.

18          THE COURT:  And do you affirm to tell the truth and

19    nothing but the truth, ma'am.

20          MS. HALLIN:  Yes, ma'am.

21      (Witness duly sworn.)

22          THE COURT:  All right.  And proceed about -- Mr.

23    Coleman is going to ask you some questions, and the government

24    or this Court may follow up.  Go ahead, Mr. Coleman.

25          MR. COLEMAN:  Miss Hallin, Mr. Anania was he

1   living -- at the time Mr. Anania was originally arrested, was

2   he living with his stepfather?

3           MS. HALLIN:  Yes.  In a different residence.

4           THE COURT:  I'm sorry.  What was that last -- in a

5   different residence, is that what you stated?

6           MS. HALLIN:  Yes, ma'am.

7           THE COURT:  All right.

8           MS. HALLIN:  Yes, ma'am.

9           THE COURT:  Thank you.  And is everybody quiet behind

10  you?  Because I'm hearing a lot of interference.

11          MS. HALLIN:  No.  I'm outside by myself.

12          THE COURT:  If there's a television on or something,

13  make sure everything is off.  All right.  Go ahead, Mr.

14  Coleman.

15          MR. COLEMAN:  And, Miss Hallin, if Mr. Anania is

16  released, would he be living with you, his stepfather, and his

17  little sister?

18          MS. HALLIN:  Yes.

19          THE COURT:  All right.  Can I get some more

20  specifics.  When you say he was living at a different residence

21  with his stepfather, is the stepfather the person you're living

22  with now?

23          MS. HALLIN:  Yes.  We were not living together at

24  that point.

25          THE COURT:  All right.  So, first of all, what is the

1   stepfather's name?

2             MS. HALLIN:  William Hallin.

3             THE COURT:  All right.  Spell that last name for me,

4   please.

5             MS. HALLIN:  H-A-L-L-I-N.

6             THE COURT:  All right.  Thank you.  And you said at

7   that time you were not living with his now stepfather, is that

8   correct?

9             MS. HALLIN:  Yes.

10            THE COURT:  All right.  And how far is that location

11  from where you are now?

12            MS. HALLIN:  A few miles.

13            THE COURT:  And how long did he live with his

14  stepfather?

15            MS. HALLIN:  From the time he was released --

16            THE COURT:  Before.

17            MS. HALLIN:  -- until the time he was arrested.

18  Before that?  He was with me before.

19            THE COURT:  He was with --

20            MS. HALLIN:  Before he --

21            THE COURT:  Okay.  So he was with you first?

22            MS. HALLIN:  He lived with -- when he was released on

23  parole, he went to live with his stepfather.

24            THE COURT:  Okay.  That's what I want to know.  Okay.

25  Is there a reason why he didn't come to live with you?

1          MS. HALLIN:  I thought it would be better if he had a
2    male role model.
3          THE COURT:  All right.  And is your -- is the
4    stepfather -- you're living together now, is that correct?
5          MS. HALLIN:  Yes, ma'am.
6          THE COURT:  And how long have you been together
7    living under the same roof?
8          MS. HALLIN:  About eight months.
9          THE COURT:  All right.  And you said there's a little
10   sister.  How old is that little sister?
11         MS. HALLIN:  16.
12         THE COURT:  All right.  And is she the daughter of
13   both you and the stepfather?
14         MS. HALLIN:  Yes.
15         THE COURT:  And what's your work schedule, ma'am?
16         MS. HALLIN:  I work Tuesday through Saturday.
17         THE COURT:  Away from the home?
18         MS. HALLIN:  Yes, ma'am.
19         THE COURT:  All right.  And what's your schedule on
20   Tuesday through Saturday?
21         MS. HALLIN:  I work at 9.  I usually -- I start at 9.
22   I usually I get off between 1 and 3.
23         THE COURT:  In the afternoon?
24         MS. HALLIN:  Yes, ma'am.
25         THE COURT:  All right.  And what about the

 1  stepfather?

 2          MS. HALLIN:  At this point he works -- he's seasonal,

 3  so he'll be done working in about a month.  But he -- during

 4  the day he usually gets off about 1:00 o'clock.

 5          THE COURT:  You both get off at the same time?

 6          MS. HALLIN:  Similar times, yes.

 7          THE COURT:  All right.  And is your daughter in

 8  school?

 9          MS. HALLIN:  They're doing at home learning.

10          THE COURT:  Remote?

11          MS. HALLIN:  They are doing e-learning right now.

12          THE COURT:  All right.  Thank you.  All right.

13  There's nothing else for the Court and the questions.  Anything

14  from plaintiff's counsel -- I mean, I'm sorry, government.  Any

15  questions?  Okay.  You're silent right now, Mr. Vandenberg.  We

16  can't hear you.

17          MR. VANDENBERG:  I would just ask how long your

18  commute is?

19          MS. HALLIN:  10 to 15 minutes.

20          THE COURT:  Anything else, Mr. Vandenberg?

21          MR. VANDENBERG:  No, Your Honor.

22          THE COURT:  All right.  Mr. Rangel, since we have her

23  on the phone, were there any questions you would like to ask

24  from Pretrial?

25          MR. RANGEL:  No, Your Honor.

1          THE COURT:  All right.  Anything else, Mr. Coleman?

2          MR. COLEMAN:  Your Honor, I would just note that

3     the -- in the previous --

4          THE COURT:  I'm sorry.  Anything else -- I'm sorry.

5     Anything else on questions of Mr. Anania's mother?

6          MR. COLEMAN:  Oh, no.

7          THE COURT:  All right.  Ma'am, thank you.  If you

8     could you mute yourself again.  We're going to continue with

9     some argument and some statements.  All right.  Thank you.

10         MS. HALLIN:  Okay.  Thank you.

11         THE COURT:  All right.  Go ahead, Mr. Coleman.

12         MR. COLEMAN:  Your Honor, I would just, I would just

13    note that the, the previous order did not follow a hearing.  It

14    was, it was issued just based on without the benefit of a

15    hearing or, or having Miss Hallin available.  I would also just

16    point out that detention is a -- the Supreme Court has said

17    detention is a carefully limited exception.  Liberty is the

18    norm in our society.  And Mr. Anania I don't believe that, you

19    know, he's -- to continue to be in detention when he has a

20    loving home that he could go to, it's a -- a lot of times many

21    of my clients don't have that.  Don't have a, a mother and a

22    stepfather and a sibling that they could go stay with, and Mr.

23    Anania has that.

24              He also has these health conditions.  And there are a

25    range of pretrial conditions that the Court can put in place to

1  have confidence that -- you know, that he will be supervised

2  and he will remain in the home.  If the Court should desire, he

3  should be on home incarceration, electronic monitoring, GPS

4  monitoring is a poten -- if that's available.  I mean, there's

5  just a range of different conditions that could be put in

6  place.

7          And the Bail Reform Act presumes that someone will be

8  released without conditions, presumes that the person will be

9  released with conditions if the judge -- if the Court doesn't

10 think with no conditions is appropriate.  And it, it can only

11 be denied if there's just absolutely no conditions that could

12 be put in place.  And there's just nothing here that -- I don't

13 think that rises to that level.  Mr. Anania has a presumption

14 of innocence.  And that's something that extends throughout the

15 case.  He has not pled guilty.  So I, so I just think that he

16 should be allowed to be released.  I think that there are

17 conditions that could be put in place, and I think it would be

18 appropriate here to do so.  Particularly given his health

19 issues and the concerns with the institution he's in.

20         THE COURT:  All right.  Thank you very much, Mr.

21 Coleman.  One thing the Court is going to do right now at this

22 time is enter and continue the motion.  I want him tested.  So,

23 you know, the Court will put that in the order.  The Court will

24 enter a call to who I need to make a call to, but he needs to

25 be tested both for COVID and for TB.  Get those things tested

1    for.  And it's going to take a little while to get some of the

2    results back.  So I want to do 21 days.  Is he in solitary

3    confinement right now, Mr. Coleman?

4            MR. COLEMAN:  I don't believe that he's in isolation

5    at this point.

6            THE COURT:  Okay.  All right.  As long as he's not.

7    Otherwise they've got to give me a reason for that.  I want to

8    know what the results of his medical testing are.  And then I

9    will take note that things are little bit different in that

10   Judge Pallmeyer did not have a hearing, which I'm sure even she

11   would at least reconsider something if she didn't have a full

12   hearing in this case.

13           I also ask that during the meantime while this Court

14   is considering this matter that Pretrial revisit with

15   supervisors what your recommendation is based on what you've

16   heard here today.  Including a conversation on -- under oath by

17   the mother.  All right, Mr. Rangel?  I'm not saying you have to

18   come to a different result.  I'm just saying make sure now that

19   we're a few months out and this matter has gone forward, that

20   we review it and make sure.

21           We actually had one recently where Pretrial totally

22   changed their mind from what they had done previously, and I

23   think it was again a similar type of case.  And I just want to

24   make sure that Pretrial is sticking by what they're saying, and

25   it's not an issue of some of it is people available to help

1    supervise, et cetera.  And this was a, a -- more of a -- more

2    expeditious decision considering all that he has going on in

3    his background, which is something the Court has to consider.

4              But as Mr. Coleman has stated, there is -- if there

5    are any type of circumstances that can be put together that

6    keeps him out of custody, then the Court just wants to triple

7    check that all of those have been considered before the Court

8    denies -- leaves the posture where it is.  All right.  So the

9    Court will give it every consideration, but I want those

10   medical tests done.  I want to get them back, and I will look

11   at where we are.  And, in fact, do a -- make sure, Mr. Rangel,

12   we're doing a background check on both the adults living in the

13   house.  And then we'll be back in 21 days.  Yvette.

14             THE CLERK:  That will be October 14th.  And it would

15   be for the same time, 11:15.

16             THE COURT:  All right.  How is that date for the

17   government and for defense and for Pretrial?

18             MR. VANDENBERG:  The government is available that

19   day, Your Honor.

20             THE COURT:  Thank you.  Mr. Coleman, are you also --

21             MR. COLEMAN:  That works for me.

22             THE COURT:  Okay.  Mr. Rangel.

23             MR. RANGEL:  Yes, that works for Pretrial.

24             THE COURT:  All right.  Thank you very much.  The

25   motion is entered and continued.  Thank you for your

1    presentations.  The order will reflect -- and if you wish, Mr.

2    Coleman, a follow-up on your client's behalf, you can.  And

3    government if you have any additional information on the status

4    of COVID cases, et cetera, over at Kankakee, the Court would

5    like for that to be passed onto the Court.  And I will make a

6    decision on the next date.

7           We would like for the defendant's mother, if at all,

8    to be present on that next day or at least be on the phone on

9    that next day.  So that if this Court makes a change in his

10   status, you can be available to be admonished and be part of

11   the plan also.  Will you be available to be available -- or

12   will you be available by phone on that date?

13          MS. HALLIN:  Yes, I am.

14          THE COURT:  All right.  Then you've got the date.

15   Again, Yvette, say it clearly.

16          THE CLERK:  Sure.  It's October 14th at 11:15 a.m.

17          THE COURT:  All right.

18          MS. HALLIN:  Okay.

19          THE COURT:  All right.  And has time been excluded

20   government?

21          MR. VANDENBERG:  Your Honor, we would move to exclude

22   time until that date.

23          THE COURT:  All right.  Any objection?

24          MR. COLEMAN:  No objection.

25          THE COURT:  All right.  Time will be excluded till

1    the next date for us to continue to discuss the issue of his

2    pretrial status.  All right.  Thank you very much for your

3    presentations.  Take care, Mr. Anania.

4              DEFENDANT ANANIA:  Thank you.

5                            CERTIFICATE

6              I HEREBY CERTIFY that the foregoing is a true,

7    correct and complete transcript of the proceedings had at the

8    hearing of the aforementioned cause on the day and date hereof.

9

10   /s/TRACEY D. McCULLOUGH                    October 7, 2020

11   Official Court Reporter                         Date
     United States District Court
12   Northern District of Illinois
     Eastern Division
13

14

15

16

17

18

19

20

21

22

23

24

25