UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | No. 19 CR 532 |
| v. | ) | |
| | ) | Judge Sharon Johnson Coleman |
| ANDREW ANANIA | ) | |

**GOVERNMENT'S RESPONSE TO DEFENDANT'S
MOTION TO SUPPRESS EVIDENCE**

The UNITED STATES OF AMERICA, by JOHN R. LAUSCH, JR., United States Attorney for the Northern District of Illinois, respectfully requests that defendant Andrew Anania's Motion to Suppress Evidence be denied after an evidentiary hearing. R.83.

Anania alleges that he was seized in violation of the Fourth Amendment, and that the court should suppress the firearm he threw and the statements he made, because law enforcement lacked reasonable suspicion to seize him and probable cause to arrest him. Officers clearly had both. The government anticipates that its evidence at a hearing will establish that, while on patrol, officers identified Anania (whom they knew by the nickname "Scarface") as the subject of an outstanding arrest warrant. The uniformed officers exited their car, identified themselves as police, and asked to speak to Anania. Anania took flight, leading the officers on a three-block chase. During Anania's flight, one officer observed Anania pull a firearm from the waistband of his pants, which Anania then threw.

1

In other words, by the time that Anania was seized after he fled, law enforcement had reasonable suspicion that Anania illegally possessed a firearm, conducted a lawful *Terry* stop of him, and based on their knowledge that Anania was a convicted felon and also on parole, lawfully arrested him for unlawful possession of a firearm. The officers also had reasonable suspicion to seize him and probable cause to arrest him based on the valid outstanding warrant.

After being advised of his *Miranda* rights, Anania confessed to having an outstanding arrest warrant and confessed to throwing the firearm into the yard because he "didn't want to get caught with the gun." His statements are admissible because his seizure and arrest were lawful.

## I. BACKGROUND[1]

The government anticipates that its evidence will establish the following:

### Warrant for Anania's Arrest

On December 26, 2018, the Illinois Department of Corrections issued a warrant for the arrest of Andrew Anania for "violating the rules and/or conditions of parole." Exhibit A. The warrant ordered that Anania "be retaken immediately into custody and be held for delivery to the Director of the Department of Corrections." *Id.*

### Approach of Anania

On February 15, 2019, at approximately 7:14 p.m., Chicago Police Department

---

[1] The government provides only those facts that are relevant for the purpose of responding to Defendant's motion. Other facts, including Anania' felony history, are not described here.

("CPD") Officers were driving eastbound on West 23rd Street near the intersection with South Albany Avenue, in Chicago, Illinois. Exhibit B, at 3. Officer Jaime Acosta was driving the unmarked vehicle; Officer Adam Bourdosis was in the front passenger seat. Exhibit C, at 1. Although the car was unmarked, the car had several attributes that made it identifiable as a police car, including spotlights mounted on the side of the car and license plates that started with the letters, "MP." In the officers' training and experience, individuals that routinely engage in criminal conduct are able to identify these "unmarked" cars as belonging to police. *Id.*, at 1-2.

Both Officer Acosta and Officer Bourdosis were familiar with the neighborhood where they were patrolling because they had been assigned to patrol in the area for approximately two-and-a-half and three years (respectively). *Id.*, at 1-2. Officer Acosta was additionally familiar with the neighborhood, having lived in the area for approximately seven years. *Id.*, at 2. Both officers understood the neighborhood to be a high crime area, specifically with regard to gang violence and gun crimes. *Id.*, at 1-2. Both officers had personally participated in dozens of arrests involving the illegal use and possession of guns in this area. *Id.*

While patrolling, Officer Bourdosis observed an individual he recognized from distinctive facial scarring as "Scarface," later identified as Anania, walking eastbound on 23rd Street. Exhibit B, at 3; Exhibit C, at 1. Anania was wearing a hat, coat, and neck warmer, with the neck warmer not covering his face. Exhibit C, at 1-2; *See e.g.* Exhibit H, at :40-2:06; Exhibit G, at :43-2:05. Officer body-camera ("BWC")

footage shows Anania's general appearance on the evening of February 15, 2019. The scarring on his face is visible in the middle picture below, in the area circled in red:



Exhibit H, at 1:32, 1:55, 2:06. This same distinctive facial scarring is evident in his booking photographs from a different arrest:

 

4

Exhibit D, at 1-2. His facial scarring and tattoos also were visible in the BWC footage of Anania's interview after his arrest in this case:



Exhibit L. Upon seeing "Scarface," Officer Bourdosis recalled that there was an active warrant for Scarface's arrest, and pointed him out to Officer Acosta. *Id.*, at 2-3. Officer Acosta also recognized Anania as "Scarface," and knew that Scarface had an active arrest warrant for a parole violation and a prior conviction for murder. *Id.*, at 2.

The officers pulled over their vehicle, got out, and began to approach Anania. *Id.*, at 2-3. As they walked toward him, Officer Bourdosis said something to the effect of, "Police, we want to talk to you." *Id.*, at 2-3.

The officers were wearing their CPD tactical vests, had walkie-talkies affixed to their tactical vests, holstered firearms, handcuffs, body cameras and a five-pointed CPD star on their vests. Exhibit C, at 2-3; *see also* Exhibit J, at 1:13; Exhibit K, at 10:14 (BWC footage of other reporting officers capturing the appearances of Officer

Bourdosis and Officer Acosta, set forth below). The officers are depicted below in the same clothing they were wearing when they approached Anania:



### *Chase and Detention of Anania*

After looking at the officers, Anania fled westbound down 23rd Street. Exhibit B, at 3. The officers gave chase. *Id.* During the chase, Officer Acosta observed Anania pull a dark semi-automatic handgun from his waistband and run with it in his hand.[2] *Id.*; Exhibit C, at 3. Officer Acosta also observed Anania holding his left side, causing Officer Acosta to believe that Anania had a second firearm. *Id.* Anania eventually ran into the gangway of a residence at 2321 South Troy Street, where Officer Acosta

---

[2] Contrary to Anania's argument that Officer Acosta's observation of Anania pulling a firearm from his waistband is "unsubstantiated" (D.83, at 4), as set forth in more detail below, law enforcement recovered the semi-automatic firearm witnessed by Officer Acosta in the yard of 2323 South Troy, one house from where Anania was detained. Further, Anania eventually confessed to possessing a gun and throwing the gun into the yard adjacent to where he was detained (though he claimed he got the gun from an unnamed acquaintance, not his waistband).

encountered him and instructed him to show his hands and get on the ground. *Id.*; Exhibit E, at 0:00-0:20. When Anania showed his hands, he was no longer carrying the firearm. *Id.* Officer Bourdosis and other officers arrived at the scene and helped Officer Acota successfully detain Anania.

### *Search for the Firearm*

Approximately two minutes after Anania's detention, CPD Officer Juan Perez arrived at the scene. Exhibit I, at 2:32. As he ran past Anania, Officer Perez also immediately identified Anania, stating, "He's got a warrant. That's Scarface." Exhibit I, at 2:36-2:41.

Approximately five minutes after Anania's detention, while Officer Acosta was searching for the firearm, another officer spoke with Officer Acosta, stating, "He's Scarface." Exhibit E, at 5:50. Officer Acosta responded, "Yeah, I know." The other officer stated, "He's wanted." Officer Acosta responded, "Yeah, I know." *Id.*

Approximately 18 minutes after Anania's detention, Officer Acosta told another officer about the chase as they looked for the firearm. Officer Acosta explained that the chase

> started right where my squad car is. We literally. pulled up next to him and got out. Cause we saw him. We said that looks like Scarface; we knew he had a warrant. He takes off running. Both of his hands were moving. One of his hands came out with the gun. The other one stayed in at the left part of his waistband.

Exhibit E, at 18:40.

Approximately twenty minutes after Anania was detained, the firearm was

recovered by law enforcement at 2323 South Troy, one house south of where Anania was detained. Exhibit B, at 3; Exhibit E, at 21:30. The firearm was a loaded .380 caliber Blue Steel Bersa Thunder semi-automatic firearm, bearing serial number E37264. Exhibit B, at 3. Officer Acosta identified the firearm as the firearm he witnessed Anania retrieve from his waistband. Exhibit B, at 3.

### *Statements by Anania*

At the scene of the arrest, Anania falsely stated that his name was "Nico Gomez" and that his birthdate was October 16, 1996. Exhibit G, at 2:28-2:32, 4:41-5:06, 16:45.

After the gun was recovered, officers transferred Anania to the 10th District Station. Exhibit B, at 3. Officer Acosta informed Anania of his *Miranda* rights. *Id.*, at 0:07- 0:49. Anania indicated that he understood each of his *Miranda* rights. *Id.*, at 0:07- 0:49. In response to questioning, Anania admitted that his name was actually Andrew Anania. *Id.*, at 0:49. When asked to explain what happened that night, Anania stated:

> Earlier, I was walking, and y'all saw me. And y'all tried to stop me, but I have a warrant, so I ran. And then, then, I ran into a certain gangway. There was someone in there, like an acquaintance that I know. And he had a gun. And I didn't want to get caught with the gun. So when I ran in, I ran into him, and threw the gun over the fence.

*Id.*, at 1:04-1:35. When asked if he threw the gun "into the next yard," Anania responded, "Yeah." *Id.*, at 1:35. Anania stated, "I'm a felon, I don't want to get caught with that shit." *Id.*, at 1:38. Anania said he didn't know the name of the acquaintance

from whom he had taken the gun. *Id.*, at 1:49. Anania admitted that he had an IDOC warrant due to a parole violation. *Id.*, at 2:17-2:31.

## II.   LAW ENFORCEMENT OFFICERS HAD REASONABLE SUSPICION TO SEIZE ANANIA

Anania claims that his Fourth Amendment rights were violated because officers lacked a reasonable suspicion that he was committing a crime when they chased and apprehended him. D. 83, at 4. This is incorrect. At the time that he was seized, after his flight, the police had reasonable suspicion to conduct a Terry stop, based both on their knowledge that there was an active arrest warrant for Scarface and based on their visual observation of Anania carrying and discarding of a firearm during his flight.

Police may stop and detain a person for investigative purposes pursuant to *Terry v. Ohio*, 392 U.S. 1 (1968). A person is seized within the meaning of the Fourth Amendment in one of two ways: by an application of physical force (even if unsuccessful); or, absent physical force, by a show of authority. *Torres v. Madrid*, 592 U.S. – (2021). In the context of a show of authority, there is no seizure unless "the person at whom it is directed actually submits to that authority." *United States v. Griffin*, 652 F.3d 793, 798 (7th Cir. 2011); *see also California v. Hodari D.*, 499 U.S. 621, 626 (1991) ("an arrest requires *either* physical force…*or,* where that is absent, *submission* to the assertion of authority"). "Simply put, a seizure effected by a show

9

of authority occurs *when the suspect submits*." *Griffin*, 652 F.3d at 801 (emphasis added).

Officer Acosta and Bourdosis' original approach of Anania on 23rd Street did not effectuate a seizure of Anania. After identifying Anania as a person with an outstanding arrest warrant, the officers exited their patrol vehicle to conduct a field interview of Anania. The officers identified themselves as police and asked to talk to Anania. The officers used no physical force at this time. They did show authority, by identifying themselves as police officers, but Anania did not submit to that assertion of authority.

Instead, Anania responded by running away from the officers, leading officers in a multi-block chase. As a result, no seizure and no *Terry* stop occurred during the initial approach of Anania on 23rd Street. *See Griffin*, at 797-801; *United States v. Patterson*, No. 16 CR 50044, 2018 WL 2238709, at *1 (N.D. Ill. May 16, 2018) (citing *Griffin* for the proposition: "evidence obtained before a suspect yields … may be considered in the probable cause determination and is not subject to suppression even if there was no probable cause at the time the officer first showed authority."); *United States v. Wilson*, 963 F.3d 701, 703 (7th Cir. 2020) (finding fleeing defendant did not submit to authority and therefore was not seized until after police caught defendant).

Instead, Anania was not seized until he was apprehended in the alleyway. At that point, his seizure was supported by reasonable suspicion—that is, articulable facts that criminal activity is afoot. *Id.* at 21-22. "Reasonable suspicion" requires

10

"more than a hunch but less than probable cause." *Jewett v. Anders,* 521 F.3d 818, 823 (7th Cir. 2008). The determination of whether an officer had reasonable suspicion is an objective inquiry based on the totality of the circumstances known to the officer at the time of the encounter. *United States v. Lawshea*, 461 F.3d 857, 859 (7th Cir. 2006). Reasonable suspicion is based on the "totality of the circumstances to see whether police 'had a particularized and objective basis for suspecting the particular person stopped of criminal activity.'" *United States v. Howell*, 958 F.3d 589, 597–98 (7th Cir. 2020) (quoting *United States v. Cortez*, 449 U.S. 411, 417–18 (1981)).

At the time he effectuated a successful *Terry* stop of Anania, Officer Acosta had sufficient reasonable suspicion to initiate a *Terry* stop. First, Officer Acosta recognized Anania as an individual who had an outstanding arrest warrant. Officer Bourdosis communicated to Officer Acosta that he also recognized Anania as having an outstanding arrest warrant. That alone gave the officers reasonable suspicion to initiate a *Terry* stop. *See e.g. United States v. Johnson*, 383 F.3d 538 (7th Cir. 2004) (finding that officers had probable cause to arrest defendant after identifying that defendant had an outstanding arrest warrant).

Contrary to defendant's argument that the officers would have been unable to recognize Anania because his head was "covered with a face mask and beanie" (D.83, at 4), the BWC footage taken immediately after Anania's detention shows that Anania's hat and neck warmer left most of his face exposed, including his distinctive facial scarring. In addition, the BWC footage reflects that other officers at the scene

were able to quickly identify Anania as "Scarface," the subject of an outstanding warrant, and corroborates that the officers were able to make the identification notwithstanding Anania's hat and warmer.

Second, although Anania's identity alone was sufficient for officers to initiate a *Terry* stop, Anania's actions created additional reasonable suspicion. When Officers Acosta and Bourdosis, dressed in a CPD tactical vest, exited their unmarked patrol car, identified themselves as police, and asked to talk to Anania, Anania responded by fleeing from the police. While fleeing, Anania pulled a firearm from his waistband and ran with the firearm in his hand. By the time Anania stopped running, Officer Acosta observed that Anania no longer had the firearm in his hands, causing Officer Acosta to conclude that Anania had tossed the firearm.

These actions—which were objectively and inherently suspicious and those of one who did not want to be caught with a firearm—also provided reasonable suspicion for the *Terry* stop. *See e.g. Illinois v. Wardlow*, 528 U.S. 119, 124 (2000) ("headlong flight – wherever it occurs – is the consummate act of evasion: It is not necessarily indicative of wrongdoing, but it is certainly suggestive of such"); *Wilson*, at 703-704 (finding a "reasonable officer could infer from defendant's flight that defendant knew he was in violation of the law," and that "unprovoked, headlong flight from police in a high-crime area put any lingering doubt to rest"); *United States v. Jeter*, 721 F.3d 746, 754-755 (7th Cir. 2013) (finding reasonable suspicion where defendant fled in

12

response to the presence of law enforcement, and grabbed the front right pocket of his shorts in a high-crime area).

III.     **LAW ENFORCEMENT OFFICERS HAD PROBABLE CAUSE TO ARREST ANANIA.**

"Subtle, and perhaps tenuous, distinctions exist between a *Terry* stop, a *Terry* stop rapidly evolving into an arrest and a *de facto* arrest . . . [and] there is no litmus-paper test for determining when a seizure exceeds the bounds of an investigative stop and becomes an arrest." *United States v. Tilmon*, 19 F.3d 1221, 1224 (7th Cir. 1994) (internal citations, quotations omitted). "The mere use or display of force in making a stop does not necessarily transform a stop into an arrest if the surrounding circumstances give rise to a justifiable fear for personal safety." *Id.* at 1226. An intrusive stop, and even the use of handcuffs, "is not tantamount to an arrest when the police have reason to believe that the suspect is armed and dangerous." *United States v. Thomas*, 79 F. App'x 908, 912 (7th Cir. 2003). In *Thomas*, the stop, which involved forcing a suspect out of a car at gunpoint, making him walk backward and kneel on the ground, and handcuffing him, only matured into an arrest when the defendant was "involuntarily transported in handcuffs to the police station." *Id. See also United States v. Bullock*, 632 F.3d 1004, 1016 (7th Cir. 2011) (noting that "using handcuffs, placing suspects in police cars, drawing weapons, and other measures of force more traditionally associated with arrests may be proper during an investigatory detention, depending on the circumstances").

13

Although the officers had probable cause that Anania illegally possessed the firearm after determining that Anania tossed the gun, the *Terry* stop did not transform fully into an arrest until the officers initiated the transfer of Anania to division headquarters During the intervening period, the officers developed additional probable cause for Anania's arrest by successfully finding the firearm that Anania had tossed during the chase. After becoming aware of all of this evidence, the officers transported Anania to the station for questioning.

The officers had probable cause to arrest Anania when they did. First, a defendant's outstanding arrest warrant provides probable cause for his arrest. *See e.g. United States v. Thornton*, 463 F.3d 693, 698 (7th Cir. 2006) (finding defendant's outstanding arrest warrant provided officers probable cause for defendant's arrest); *United States v. Johnson*, 383 F.3d 538, 546 (7th Cir. 2004) ("the officers' knowledge that [defendant] was wanted on an outstanding warrant constituted an intervening circumstance, which gave officers probable cause to arrest [defendant] independent of the illegality of the initial unlawful stop"); *United States v. Green*, 111 F.3d 515, 521 (7th Cir. 1997) (holding that lawful arrest based on outstanding warrant constituted intervening circumstances that dissipated any taint caused by stop that lacked reasonable suspicion); *United States v. Snowden*, 2007 WL 2818389, *2-3 (7th Cir. 2007).

Here, the officers initially approached Anania because they recognized him as having an outstanding arrest warrant. After Anania was detained, other officers

reporting to the scene further identified Anania as having an outstanding arrest warrant. Anania does not contest that he had an outstanding warrant for his arrest; Anania admitted to having an outstanding warrant during his post-arrest interview. That outstanding arrest warrant gave officers independent probable cause to arrest Anania.

Second, Anania's toss of a gun in response to the presence of law enforcement was sufficient to create probable cause that he did not legally possess the firearm. *See e.g. United States v. Sawyer*, 224 F.3d 675 (7th Cir. 2000) (as long as [officer] reasonably believed there was a substantial chance that the object [defendant] dropped was a firearm, he had probable cause to arrest [defendant]"); *United States v. Colbert*, 2013 WL 2477074, *4 (N.D.Ill. June 10, 2013) (finding that officers had sufficient basis for a probable cause arrest when defendant threw away a gun after officers approached); *United States v. Williams*, 333 Fed. App'x 127, 128 (7th Cir. 2009) ("once the officers saw the gun thrown, they had probable cause to make an arrest").

Here, Anania's immediate response to the arrival of law enforcement was to flee from law enforcement and to pull a firearm from his waistband. After performing a *Terry* stop and a protective patdown of Anania, the officers found that Anania no longer had a gun on his person and therefore concluded that Anania tossed the gun during his flight from law enforcement. The totality of the facts and circumstances, including Anania's flight from the police and his tossing of the gun in his possession,

created probable cause that Anania possessed the firearm illegally.

Third, Officer Acosta recognized "Scarface" as having a prior conviction for murder. Anania's criminal history made it illegal for him to possess a firearm. *See* 18 U.S.C. § 922(g)(1); 720 ILCS 5/24-1.1(a). This knowledge, likewise, provided probable cause for Anania's arrest after he was seen in possession of a firearm.

IV.   **CONCLUSION**

For the foregoing reasons, the government respectfully requests that the Court deny Defendant's motion to suppress.

Respectfully submitted,

JOHN R. LAUSCH, JR.
United States Attorney

BY:    s/ Cornelius A. Vandenberg
       CORNELIUS A. VANDENBERG
       Assistant U. S. Attorney
       219 S. Dearborn
       Chicago, Illinois 60604
       (312) 353-5310

Dated: August 18, 2021

16